UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA


STOCKTON EXECUTIVE LIMOUSINE
CHARTER SERVICE, INC.,

                                  NO. CIV. S-04-1999 LKK/PAN

        Plaintiff,

    v.

                                    O R D E R

UNION PACIFIC RAILROAD, et al.,

        Defendants.

_____/

     On September 17, 2004, plaintiff, Stockton Executive

Limousine Charter Services ("Stockton Executive"), filed a second

amended complaint against defendants Union Pacific Railroad Co.

(UPRC or "Union Pacific"), Crew Transport Services Inc. (CTS), and

Rezenberger, Inc. alleging four causes of action: (1) violation of

§ 17200 of the California Business & Professions Code (against all

defendants); (2) intentional interference with prospective economic

advantage (against CTS and Rezenberger); (3) intentional

interference with contract (against CTS and Rezenberger); and (4)

breach of contract (against Union Pacific).

1

1   The matter is before the court on motions for summary judgment

2   filed by defendants UPRC and Rezenberger.  On February 26, 2006,

3   plaintiff requested that the court grant Rezenberger's motion for

4   summary judgment as to all claims.  The court will do so, and

5   accordingly, this order will not discuss the claims as they relate

6   to Rezenberger.[1]

7   On March 1, 2006, the parties stipulated to dismiss claims

8   against CTS with prejudice.  Consequently, the only claims left in

9   this litigation relate to Union Pacific (§ 17200 and breach of

10  contract).  Thus, the court will only discuss Union Pacific's

11  motion for summary judgment.

**I.**

**UNDISPUTED FACTS**[2]

14  On May 15, 1979, Western Pacific Railroad ("Western Pacific")

15  entered into an agreement with Executive Limousine to provide

16  Western Pacific with transportation of its employees and crews from

17  Stockton, California, to points designated by Western Pacific.

18  The entire contract reads as follows:

19  AGREEMENT TO PROVIDE TRANSPORTATION SERVICES

20  EXECUTIVE LIMOUSINES, a California corporation, hereby agrees
    to provide WESTERN PACIFIC and WESTERN PACIFIC hereby agrees
21  to engage EXECUTIVE LIMOUSINES to transport railroad
    employees and crews from Stockton, California, to points
22  designated by WESTERN PACIFIC.  As compensation WESTERN

---

[1]   At oral argument, counsel for plaintiff also conceded the
statute of limitations arguments raised by Rezenberger in their
papers.

[2]   Unless otherwise noted, facts are undisputed for purposes
of this motion.

2

1    PACIFIC agrees to pay EXECUTIVE LIMOUSINES, ONE DOLLAR
     ($1.00) per railroad mile.  WESTERN PACIFIC recognizes that
2    EXECUTIVE LIMOUSINES is purchasing substantial equipment in
     reliance on this agreement and therefore agrees to give
3    EXECUTIVE LIMOUSINES the exclusive right to transport WESTERN
     PACIFIC crews from Stockton, so long as EXECUTIVE LIMOUSINES
4    is physically capable of providing this service.

5    The contract was signed by Ken Maybury of Western Pacific and Tom

6    Daniels of Executive Limousines.  Ex. A, Pl.'s Second Amended

7    Complaint ("SAC").

8        The parties agree that Stockton Executive and Union Pacific

9    are the successors-in-interest to Executive Limousines and Western

10   Pacific, respectively.  Ex. 1, Pl.'s SAC, Bowman Dep. at 101:13-

11   101:15.[3]    Stockton Executive continued to provide transportation

12   services for Union Pacific train crews after Union Pacific merged

13   with Western Pacific and Southern Pacific.[4]  Bowman Dep. at 118:1-

14   12; 136:19-25.

15       From the inception of the 1979 contract through 1996, Stockton

16   Executive and Union Pacific agreed to set new rates from time to

17   time for Stockton Executive's services.  Howe Dec. at ¶ 3.

18   _____

19   [3]  Donald Bowman, Stockton Executive's vice-president,
     explained that his mother, Caroline Bowman, purchased Executive
     Limousines in about 1990, which ultimately became Stockton
20   Executive. Bowman Dep. at 18:3-6; 27:11-15; 39:8-15.  After 1990,
     Mecca Equipment Corporation "absorbed" Stockton Executive.
21   Caroline Bowman formed Mecca as a vehicle to manage her business
     interests, which also include a taxi company and a saloon.  Bowman
22   Dep. at 24:25-25:17.

23   [4]  In 1982, the former interstate Commerce Commission approved
     a merger between Union Pacific and Western Pacific.  Ex. 3, Pl.'s
24   SAC; Ex. 1, SAC, Union Pacific's Answer to SAC at ¶¶ 4-5.   In
     August 1996, the Surface Transportation Board approved a merger
25   between Union Pacific and Southern Pacific Transportation Company.
     See 1996 WL 467636, Surface Transportation Board Decision (August
26   6, 1996).

3

1  Stockton Executive expanded its fleet of transportation vehicles

2  in response to Union Pacific's request for service under the

3  Agreement.  Howe Dec. ¶ 5.  At no time between 1982 and 2001 was

4  a distinction made between Western Pacific or Union Pacific rail

5  runs.  Howe Dec. ¶ 5.  From the mid-1990s through termination of

6  the contract in June 2001, Stockton unilaterally set new rates at

7  least once for its services and added charges for driver waiting

8  time.  Howe Dep., at 97:6-98:2; Brandon Dec., Ex. 4 to Howe Dep.

9  From 1991 to 1996, Union Pacific compensated Stockton Executive at

10  a rate of $1.48 per railroad mile for transportation services and

11  $12.00 per hour for waiting time.  Howe Dec. at ¶ 6.

12      On or about April 23, 1996, Stockton Executive proposed a rate

13  increase from $1.48 to $1.57 per railroad mile for transportation

14  services and from $12.00 to $17.00 per hour waiting time.  Howe

15  Dec. at 2; Brandon Dec., Ex. 4 to Howe Dep.  Union Pacific did not

16  agree to these new rates or added charges.  Ferrell Dec. at 2; Howe

17  Dep. at 97:6-98:2.  Union Pacific notified Stockton Executive that

18  it did not agree to the rate increase by letter dated May 17, 1996

19  from Robin Robinson, General Manager of Crew Transport Services,

20  Inc. ("CTS"), Union Pacific's agent.  Howe Dec. ¶ 7.  At that time,

21  CTS sent a letter to Stockton Executive asking it to sign an

22  agreement which provided for new terms.  Ex. 5, Howe Dep.

23      Stockton Executive's performance under the contract, i.e.,

24  transportation services for Union Pacific crews and employees

25  continued uninterrupted until Union Pacific terminated the

26  Agreement effective August 8, 2001.  Howe Dec. at ¶ 9.  On June 8,

4

1  2001, Union Pacific terminated the 1979 contract based, in part,

2  on Stockton Executive's charges.  Ferrell Dec. at 2.[5]

3      According to Stockton Executive, it has, at all times, been

4  "physically capable of providing transportation services to Union

5  Pacific, its crews and employees and continues to be physically

6  capable of such performance today."  Howe Dec. at ¶ 10.  The

7  contract, executed on May 15, 1979, is the only written agreement

8  that exists between Stockton Executive and Union Pacific.  Bowman

9  Dep. at 100:13-101:15, 118:1-12.  The contract has never been

10 modified in writing.

11                              **II.**

12      **SUMMARY JUDGMENT STANDARDS UNDER FED. R. CIV. P. 56**

13      Summary judgment is appropriate when it is demonstrated that

14 there exists no genuine issue as to any material fact, and that the

15 moving party is entitled to judgment as a matter of law.  Fed. R.

16 Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398 U.S. 144,

17 157 (1970); Secor Limited v. Cetus Corp., 51 F.3d 848, 853 (9th

18 Cir. 1995).

19

20      [5]  Ferrell explains that he wrote a letter to Stockton
   Executive cancelling their contract.  As explained in the letter,
21 the reasons why the contract was terminated, included: (1) numerous
   safety complaints from Union Pacific train crew employees about the
22 safety deficiencies of the vehicles used by Stockton, (2) numerous
   performance issues where Stockton's vehicles were late in picking
23 up and delivering crews, (3) Stockton's failure to agree to a
   contract with specific safety, insurance, operating and indemnity
24 language, all of which was lacking in the Stockton/Western Pacific
   contract and (4) Stockton charging rates that were higher than
25 existing rates for the Stockton, CA area offered by other carriers.
   Stockton also billed Union Pacific for wait time not specified in
26 the contract.  Ferrell Dec. at 2.

1    Under summary judgment practice, the moving party

2    [A]lways bears the initial responsibility of informing
     the district court of the basis for its motion, and
3    identifying those portions of "the pleadings,
     depositions, answers to interrogatories, and admissions
4    on file, together with the affidavits, if any," which it
     believes demonstrate the absence of a genuine issue of
5    material fact.

6  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

7  "[W]here the nonmoving party will bear the burden of proof at

8  trial on a dispositive issue, a summary judgment motion may

9  properly be made in reliance solely on the 'pleadings, depositions,

10 answers to interrogatories, and admissions on file.'" Id. Indeed,

11 summary judgment should be entered, after adequate time for

12 discovery and upon motion, against a party who fails to make a

13 showing sufficient to establish the existence of an element

14 essential to that party's case, and on which that party will bear

15 the burden of proof at trial. See id. at 322. "[A] complete

16 failure of proof concerning an essential element of the nonmoving

17 party's case necessarily renders all other facts immaterial." Id.

18 In such a circumstance, summary judgment should be granted, "so

19 long as whatever is before the district court demonstrates that the

20 standard for entry of summary judgment, as set forth in Rule 56(c),

21 is satisfied." Id. at 323.

22    If the moving party meets its initial responsibility, the

23 burden then shifts to the opposing party to establish that a

24 genuine issue as to any material fact actually does exist.

25 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

26 586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

6

1   391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

2   In attempting to establish the existence of this factual

3   dispute, the opposing party may not rely upon the denials of its

4   pleadings, but is required to tender evidence of specific facts in

5   the form of affidavits, and/or admissible discovery material, in

6   support of its contention that the dispute exists.  Fed. R. Civ.

7   P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First Nat'l

8   Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.

9   1998).   The opposing party must demonstrate that the fact in

10  contention is material, i.e., a fact that might affect the outcome

11  of the suit under the governing law, Anderson v. Liberty Lobby,

12  Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Assoc. of

13  Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992)

14  (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,

15  809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine,

16  i.e., the evidence is such that a reasonable jury could return a

17  verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see

18  also Cline v. Industrial Maintenance Engineering & Contracting Co.,

19  200 F.3d 1223, 1228 (9th Cir. 1999).

20  In the endeavor to establish the existence of a factual

21  dispute, the opposing party need not establish a material issue of

22  fact conclusively in its favor.  It is sufficient that "the claimed

23  factual dispute be shown to require a jury or judge to resolve the

24  parties' differing versions of the truth at trial."  First Nat'l

25  Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631.

26  ////

1 Thus, the "purpose of summary judgment is to 'pierce the pleadings

2 and to assess the proof in order to see whether there is a genuine

3 need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R.

4 Civ. P. 56(e) advisory committee's note on 1963 amendments); see

5 also International Union of Bricklayers & Allied Craftsman Local

6 Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir.

7 1985).

8        In resolving the summary judgment motion, the court examines

9 the  pleadings,  depositions,  answers  to  interrogatories,  and

10 admissions on file, together with the affidavits, if any.  Rule

11 56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093

12 (9th Cir. 1999).  The evidence of the opposing party is to be

13 believed, see Anderson, 477 U.S. at 255, and all reasonable

14 inferences that may be drawn from the facts placed before the court

15 must be drawn in favor of the opposing party, see Matsushita, 475

16 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654,

17 655 (1962) (per curiam)); See also Headwaters Forest Defense v.

18 County  of  Humboldt,  211  F.3d  1121,  1132  (9th  Cir.  2000).

19 Nevertheless, inferences are not drawn out of the air, and it is

20 the opposing party's obligation to produce a factual predicate from

21 which the inference may be drawn.  See Richards v. Nielsen Freight

22 Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d

23 898, 902 (9th Cir. 1987).

24        Finally, to demonstrate a genuine issue, the opposing party

25 "must do more than simply show that there is some metaphysical

26 doubt as to the material facts. . . . Where the record taken as a

1  whole could not lead a rational trier of fact to find for the

2  nonmoving party, there is no 'genuine issue for trial.'"

3  Matsushita, 475 U.S. at 587 (citation omitted).

4                              **III.**

5                            **ANALYSIS**

6        Union Pacific moves for summary judgment on both claims

7  brought against it.  As I explain below, Union Pacific's motion

8  must be denied in part and granted in part as to the breach of

9  contract claim, and granted as to the Business and Professions Code

10 § 17200 claim.

11 **A.   BREACH OF CONTRACT CLAIM**

12     In its second amended complaint, Stockton Executive avers that

13 Union Pacific breached the 1979 contract in three ways, by:

14     "a.   engaging transportation companies other than Stockton
       Executive, which pursuant to the 1979 contract, should have
15     been performed exclusively by Stockton Executive;

16     b.   preventing Stockton Executive from providing
       transportation services for UPRC employees traveling from
17     Stockton;

18     c.   Purporting to cancel the 1979 contract while Stockton
       Executive remained "physically capable of providing this
19     service," in violation of the terms of the 1979 contract."

20 SAC at 9.

21     Defendant argues that it is entitled to summary adjudication

22 as to the breach of contract claim for several reasons.  I turn

23 to Union Pacific's contentions below.

24     **1.   Was Union Pacific Entitled to Terminate the Contract?**

25     Stockton Executive alleges in its SAC, inter alia, that Union

26 Pacific breached the 1979 contract by "[p]urporting to cancel the

                                9

1    1979 contract" while Stockton Executive remained "physically

2    capable of providing this service." SAC at 9.  Union Pacific, on

3    the other hand, urges this court to grant summary judgment in its

4    favor because it argues that because Stockton Executive "materially

5    breached the Contract when it unilaterally increased the rates and

6    fees," Union Pacific was entitled to terminate the contract. Mot.

7    at 6.  Union Pacific's argument, however, is belied by the

8    undisputed facts.

9        Cal. Civ. Code § 1689 permits the rescission of a contract

10   "[i]f the consideration for the obligation of the rescinding party

11   fails, in whole or in part, through the fault of the party as to

12   whom he rescinds." As Union Pacific points out, California courts

13   have applied this provision to entitle a party to rescind a

14   contract when one party's "default in performance went to the very

15   root of the consideration bargained for," such that the "breach

16   amounted to a failure of consideration." See, e.g., Wilson v.

17   Corrugated Kraft, 117 Cal.App.2d 691, 696 (1963). Defendant relies

18   on Wilson to argue that Stockton Executive did not have a

19   unilateral right to set new rates for its services and driver

20   waiting time, which justified Union Pacific's termination of the

21   contract.[6]

22   _____

23      [6]   The court notes that Wilson v. Corrugated Kraft, 117
     Cal.App.2d 691, 696 (1963) is distinguishable from the instant
     case.  There, the plaintiff agreed to buy from the defendant, a box
24   manufacturer, all of its requirements for corrugated paper
     products.  Defendant cancelled the contract when plaintiff began
25   to purchase products from other sources.  The court explained that
     plaintiff "wilfully departed from a fundamental obligation under
26   the contract" by actually purchasing products from another

                                    10

1    The court cannot agree that Stockton Executive materially

2  breached the contract by requesting higher rates than previously

3  agreed in the 1979 contract justifying rescission of the contract.

4  The parties' subsequent course of performance undermines

5  defendant's contention that plaintiff breached the contract by

6  raising their service rates and waiting time charges.  The record

7  reflects that Stockton Executive's attempt to raise service rates

8  and waiting time charges was promptly rejected by Union Pacific,

9  at which point the parties continued to perform the contract based

10 on previous terms.  Stockton Executive did not stop its services

11 when defendant refused to pay the new rates it proposed, nor did

12 it insist on enforcing the new rates.  Rather, it continued to

13 provide services and accepted the previously agreed upon rates.

14 The facts do not demonstrate that Stockton Executive denied the

15 defendant the benefit of the agreement, or that any "default in

16 performance went to the very root of the consideration bargained

17 for."  Wilson, supra, at 696.

18    The parties do not dispute that on April 23, 1996, via letter,

19 Stockton Executive proposed a rate increase from $1.48 to $1.57 per

20 railroad mile for transportation services and from $12.00 to $17.00

21 per hour waiting time.  Howe Dec. at 2; Brandon Dec., Ex. 4 to Howe

22 Dep.  Union Pacific notified Stockton Executive by letter dated May

23

24 manufacturer.  In the instant case, although plaintiff sent a
   letter purporting to raise rates for its services, when defendant
   refused to pay the new rates, plaintiff did not attempt to enforce
25 the higher rates, but continued to perform so that it cannot be
   said that plaintiff did "wilfully depart from a fundamental
26 obligation under the contract" to perform as promised.

11

1   17, 1996 that it did not agree to the rate increases, and also

2   attached an agreement which provided for new contract terms, though

3   it is not clear whether that contract was ever signed by Stockton

4   Executive.  What is clear, however, is that the parties continued

5   to perform the contract uninterrupted until Union Pacific

6   terminated the contract five years later, in 2001.  Howe Dec. at

7   ¶ 9.  As Stockton Executive contends, it attempted to renegotiate

8   its mileage and wait time rates after five years at the same rate,

9   but Union Pacific "refused to pay the requested increase." Opp'n

10   at 4.  Union Pacific did not materially breach the contract when

11   it proposed new rates because it appears they did not enforce these

12   rates and continued to perform under previous terms.  The court

13   must deny defendant's motion for summary judgment as to the breach

14   of contract claim based on this contention.

15           **2.  Scope of Stockton Executive's Damages**

16      Union Pacific seeks to contain the plaintiff's damages under

17   the breach of contract claim to services Stockton Executive

18   provided to Western Pacific when it merged with Union Pacific in

19   1982.  Union Pacific urges the court to limit any damages award to

20   that which is "commensurate with Western Pacific's pre-merger use

21   of Stockton Executive for trips "from Stockton."  Mot. at 7.  It

22   is unclear from Union Pacific's brief whether by "commensurate"

23   Union Pacific means "trips from Stockton" or the amount of business

24   that existed between the parties before Western Pacific merged with

25   Union Pacific, or both.  Out of an abundance of caution, the court

26   addresses both possible arguments below.

1                    **I.   Trips other than those from Stockton**

2          In discovery, Stockton Executive's vice president indicated

3    that he would seek damages associated with the full extent of the

4    transportation  services  Stockton  Executive  provided  to  Union

5    Pacific in the years preceding the termination of the contract.

6    Def.'s Ex. 2 at 70:10-19.   The parties do not dispute that the

7    plain terms of the 1979 contract only required Union Pacific to

8    give Stockton Executive the "exclusive right to transport [Union

9    Pacific] crews from Stockton."   Def.'s Ex. A.   The record reflects,

10   however, that Union Pacific also used Stockton Executive "for years

11   and years transporting crews in other areas," and that "more than

12   half" of Union Pacific's crew "were being transported from

13   somewhere else."   Bowman Dec. at 101-104.   Although plaintiff seeks

14   damages relating to transportation of services from places other

15   than Stockton, it cannot do so.

16         The court looks first to the contract and a party's

17   performance or non-performance in order to determine the measure

18   of damages sought.   "A cause of action for damages for breach of

19   contract is comprised of the following elements: (1) the contract,

20   (2) plaintiff's performance or excuse for nonperformance, (3)

21   defendant's breach, and (4) the resulting damages to plaintiff."

22   Careau & Co. v. Security Pacific Business Credit, Inc., 222

23   Cal.App.3d 1371 (1990) (citing Reichert v. Gen. Ins. Co. 68 Cal.2d

24   822, 830 (1968)).   The contract's terms undoubtedly define the

25   damages Stockton Executive may claim.   It is undisputed that the

26   only  written  agreement  that  existed  between  the  parties,  as

                                   13

1   successors-in-interests, is the May 15, 1979 contract.  The parties

2   both agree the 1979 contract has never been modified in writing.

3   Bowman Dep. at 100:13-101:15, 118:1-12.  The 1979 contract states

4   in unambiguous terms, that "EXECUTIVE LIMOUSINES" shall "transport

5   railroad employees and crews from Stockton, California," and that

6   the agreement gives "EXECUTIVE LIMOUSINES the exclusive right to

7   transport WESTERN PACIFIC crews from Stockton, so long as EXECUTIVE

8   LIMOUSINES is physically capable of providing this service."

9   Def.'s Ex. A.  The plain language of the contract demonstrates that

10  Union Pacific was not required to use Stockton Executive for trips

11  other than those that were "from Stockton," and thus damages must

12  be confined to any failure on the part of defendants to engage

13  plaintiff to transport employees and crews "from Stockton."

14      The contract is silent as to the parties' obligations when

15  Stockton Executive provided services for trips other than those

16  "from Stockton."  Plaintiff suggests in its opposition brief that

17  the parties' "long, consistent course of performance is

18  determinative as to the scope of damages Plaintiff may claim."

19  Opp'n at 5.  Plaintiff relies on City of Santruz v. Younger, 223

20  Cal.App.2d 818 (1963) and Cutter Lab, Inc v. Twining, 221

21  Cal.App.2d 320 (1963), which held that course of performance gives

22  rise to a "practical interpretation" of the original agreement.

23  It is true that the purpose of judicial interpretation is to

24  ascertain the parties' intentions, and that the parties' own

25  practical interpretation of the contract – how they actually acted

26  – can be an important aid to the court.  Nonetheless, the doctrine

1  of "practical interpretation" is not applicable in the instant

2  case.  California law establishes that the parties' course of

3  conduct, or the doctrine of practical construction, "can only be

4  applied when the contract is ambiguous, and cannot be used when the

5  contract is unambiguous."  Crestview Cemetery Ass'n v. Dieden, 54

6  Cal.2d 744 (1960).  Here, the contract unambiguously defines that

7  the transportation services at issue only related to trips "from

8  Stockton."  The court cannot - as plaintiff suggests - consider

9  course of performance to add new terms and obligations to the

10 contract when the existing contract terms are unambiguous.  See

11 Levi Strauss & Co. v. Aetna Cas. & Sur. Co., 184 Cal.App.3d 1479,

12 1486 (1986)("[A] court does not have the power to create for the

13 parties a contract which they did not make, and it cannot insert

14 in the contract language which one of the parties now wishes were

15 there.")  Therefore, any damages award for plaintiff for breach of

16 contract must relate to trips "from Stockton" as stated in the 1979

17 contract.[7]

18        **ii    Commensurate to pre-merger use of Stockton**
               **Executive for trips "from Stockton."**

19

20     Union Pacific argues that the court should hold that Stockton

21 Executive's damages, if any, must be commensurate with Western

22

23        [7]  Plaintiff has not argued or plead that it is bringing a
   breach of contract claim for other contracts which may have been
   formed between the parties as to transportation services it
24 provided for Union Pacific.  The complaint makes clear that it is
   only suing as to alleged breaches of "terms of the 1979 contract."
25 SAC at 9:12, 20.  Moreover, a contention of oral amendment would
   raise "equal dignities" and statute of fraud issues because of the
26 statute of frauds which bars an oral agreement.

15

1  Pacific's pre-merger use of Stockton Executive for trips "from

2  Stockton."  Mot. at 11.  In their reply brief, defendant contends

3  that any contract damages must "correspond to the volume of trips

4  'from Stockton' that [Stockton Executive] was performing for

5  Western at the time of the UPR-Western merger."  Repl. at 10.

6  These two statements could be read to mean that Union Pacific

7  believes that contract damages must correspond to the same amount

8  of business which was what Western had given to Stockton executive

9  in 1979, whether or not that business included trips "from

10 Stockton."

11     Union Pacific cites a number of cases where courts held that

12 a merger, in and of itself, does not alter or expand the

13 contractual obligations of the surviving corporation.  See, e.g.,

14 Hall v. Paramount Pictures Corp., 2002 WL 1858766 (S.D.N.Y. 2002).

15 While the court agrees that the merger cannot alter the parties'

16 contractual obligations unless they agreed to obligations outside

17 of the contract, the court cannot hold that contractual damages in

18 the instant case must be proportional or commensurate to the amount

19 of business between the parties pre-merger.  The 1979 contract

20 merely states that Executive Limousine would provide for

21 transportation services "from Stockton," and the rates Executive

22 Limousine would charge for its services and for driver waiting

23 time.  There is no mention of the amount of business, or how much

24 service plaintiff would provide for defendant, in 1979 or in the

25 future.  Thus, although the court can hold that the contract gave

26 exclusive rights only as to routes from Stockton, and thus damages

16

1  must relate only as to those rights, the court cannot hold that the

2  parties agreed to the same volume of business which reflected

3  Western Pacific's use of Stockton Executive at the time of its

4  merger with Union Pacific.  Consequently, the court also cannot

5  hold that plaintiff's contract damages must be confined to an

6  amount which corresponds to the amount of business entered into

7  between the parties pre-merger.  See Levi Strauss & Co., 184

8  Cal.App.3d at 1486 (1986)("[A] court does not have the power to

9  create for the parties a contract which they did not make, and it

10  cannot insert in the contract language which one of the parties now

11  wishes were there.").

12              **iii.   Statute of Limitations**

13      Plaintiff concedes that it is entitled to damages for

14  transporation services only for four years before it filed this

15  suit on November 13, 2003.  Thus, the court holds that Stockton

16  Executive may not seek damages for transportation services it would

17  have provided before November 13, 1999.

18  **B.   CALIFORNIA BUSINESS AND PROFESSIONS CODE § 17200 CLAIM**

19      Union Pacific contends that Stockton Executive's § 17200 claim

20  under California's Unfair Competition Law ("UCL") should be

21  dismissed in its entirety because plaintiff seeks damages available

22  under contract law, a remedy unavailable under the UCL statute.

23  Union Pacific's argument is well-taken.

24      The remedies available under the UCL are restitution and

25  injunctive relief.  Korea Supply Co., 29 Cal. 4th at 1144.  In the

26  context of the UCL, an order for restitution compels a defendant

17

1  to return money obtained through an unfair business practice to

2  those persons in interest from whom the property was taken.  Id.

3  Although restitution "is broad enough to allow a plaintiff to

4  recover money or property in which he or she has a vested

5  interest," Korea Supply, 29 Cal.4th at 1149, "[c]ompensation for

6  a lost business opportunity is a measure of damages and not

7  restitution to the alleged victims," Id. at 1151.

8       In the instant case, plaintiff's allegations make clear that

9  plaintiff takes issue with defendant's participation in a "scheme"

10 to "poach runs assigned to Stockton Executive" whereby plaintiff

11 was deprived of previously contracted business opportunities. See,

12 e.g., SAC at 6 (defendants "interfer[ed] with known existing

13 contractual relationship between Stockton Executive between

14 Stockton Executive and UPRC.").  Plaintiff also concedes that the

15 gist of its cause of action for violation of California Business

16 & Professions Code § 17200 is that it had been damaged by

17 defendant's conduct, which resulted in Rezenberger performing

18 transportation services that Stockton Executive allegedly had the

19 exclusive right to perform.  SAC at ¶¶ 14-16, 22.

20      Nowhere in Stockton Executive's SAC does it allege - nor could

21 it - that Union Pacific has engaged in any conduct where it has

22 obtained money or property that it was not entitled to keep.  Nor

23 has Stockton Executive alleged that Union Pacific is holding funds

24 that would be akin to unpaid wages, or "vested interests" that

25 plaintiff is entitled to, which may be considered "restitution"

26 under Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134

18

1  (2003).  The damages sought by Stockton Executive rests on

2  assertions that, but for Union Pacific's breach, it would have

3  provided Union Pacific with additional transportation services.

4  Plaintiff's allegations amount to a breach of contract claim and

5  it is therefore only entitled to contract damages.  Because

6  Stockton Executive seeks damages rather than the limited remedies

7  available under the UCL, the UCL does not provide a basis for

8  recovery.  Accordingly, this court must grant defendant's motion

9  for summary adjudication as to plaintiff's § 17200 UCL claim.

10                               **IV.**

11                           **CONCLUSION**

12     For all the foregoing reasons, the court hereby ORDERS that:

13     1.  Union Pacific's motion for summary judgment as to the

14  breach of contract claim is GRANTED in part and DENIED in part as

15  consistent with the order.

16     2.  Union Pacific's motion for summary judgment as to the

17  § 17200 claim is GRANTED.

18     IT IS SO ORDERED.

19     DATED:  March 23, 2006.

20
                                /s/Lawrence K. Karlton
21                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
22                              UNITED STATES DISTRICT COURT

23

24

25

26

                                 19